**MOBIL OIL CORPORATION, Exxon Corporation, Gulf Oil Corporation, and Marathon Oil Company, Plaintiffs,**

v.

**The DEPARTMENT OF ENERGY, and James B. Edwards, Secretary of Energy, Defendants.**

**No. 79–CV–11.**

United States District Court, N. D. New York.

Sept. 21, 1982.

Donovan, Leisure, Newton & Irvine, Washington, D. C., Charles S. Lindberg, Francis A. Rowen, Jr., New York City, Bond, Schoeneck & King, Syracuse, N. Y., for plaintiff Mobil Oil Corp.; Andrew J. Kilcarr, Washington, D. C., Thomas R. Trowbridge, III, New York City, John M. Freyer, Syracuse, N. Y., of counsel.

Miller & Chevalier, Washington, D. C., MacKenzie, Smith, Lewis, Michell & Hughes, Syracuse, N. Y., for plaintiffs Exxon Corp. and Gulf Oil Corp.; Donald B. Craven, Jay L. Carlson, James P. Tuite, Nancy G. Miller, Washington, D. C., Jay W. Wason, Syracuse, N. Y., of counsel.

Barbara Finney, Houston, Tex., for plaintiff Exxon Corp.

Robert F. Ochs, J. Ronald Sandberg, Houston, Tex., for plaintiff Gulf Oil Corp.

Akin, Gump, Hauer & Feld, Washington, D. C., John A. Evans, Findlay, Ohio, Costello, Cooney & Fearon, Syracuse, N. Y., for plaintiff Marathon Oil Co.; Daniel Joseph, Warren E. Connelly, Washington, D. C., Donald L. Nicholas, Syracuse, N. Y., of counsel.

Regulatory Litigation Div., Dept. of Energy, Washington, D. C., Gustave J. DiBianco, Acting U. S. Atty., N. D. N. Y., Syracuse, N. Y., for defendants; David A. Engels, Dennis Moore, Floyd Robinson, Jo Ann Scott, Washington, D. C., Joseph A. Pavone, Asst. U. S. Atty., Syracuse, N. Y., of counsel.

Batzell, Nunn & Bode, Washington, D. C., Sanford, Papworth & Trespasz, Syracuse, N. Y., amicus curiae for Independent Ter-

minal Operators Ass'n; William H. Bode, Alford Lawrence Toombs, Washington, D. C., Samuel C. Sanford, Syracuse, N. Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

The plaintiff oil refiners have instituted this action to obtain declaratory relief in connection with certain provisions of the Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212, that pertained to motor gasoline. Specifically, the plaintiffs have challenged the procedural and substantive validity of a "three cent" retail price equalization rule which contained a "deemed recovery" component. Alternatively, they have contested the validity of an "equal application" rule, which also contained a deemed recovery component. Jurisdiction is invoked under Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973 [EPAA], 15 U.S.C. § 754(a)(1), Section 211 of the Economic Stabilization Act of 1970 [ESA], 12 U.S.C. § 1904 note, Section 523(b) of the Energy Policy and Conservation Act, 42 U.S.C. § 6393(b); Section 502(b) of the Department of Energy Organization Act, 42 U.S.C. § 7192(b), the Administrative Procedure Act, 5 U.S.C. § 702, and under 28 U.S.C. §§ 1331, 1337, 1361, 2201, and 2202.

Presently before the Court are the plaintiffs' motion for summary judgment, and the defendants' cross-motion for summary judgment.

## I.

In 1971, President Nixon announced his Economic Stabilization Program, which, as embodied in the ESA, was intended to halt the rising tide of inflation, which, at that time, was plaguing the country. A supervisory body of this Program, the Cost of Living Council [CLC], was delegated the authority to issue regulations necessary to the accomplishment of this objective.

Beginning in 1973, the CLC, in an effort to stem the spiraling prices of petroleum products, promulgated a number of rules that imposed mandatory price controls upon refiners. See 38 Fed.Reg. 15765 (June 15, 1973); 38 Fed.Reg. 19464 (July 20, 1973); 38 Fed.Reg. 21593 (August 9, 1973); 38 Fed. Reg. 22536 (August 22, 1973); 38 Fed.Reg. 23794 (September 4, 1973); 38 Fed.Reg. 25686 (September 14, 1973); 38 Fed.Reg. 28845 (October 17, 1973); 38 Fed.Reg. 30267 (November 2, 1973); 38 Fed.Reg. 31686 (November 16, 1973); 38 Fed.Reg. 33577 (December 6, 1973). Although these controls placed ceilings upon the maximum prices that refiners could charge for motor gasoline, they did not purport to forbid refiners from setting prices that were less than the regulatory limitations. See Fed.Reg. at 15765; 38 Fed.Reg. at 19464.

Congress also sought to limit petroleum prices. In November, 1973, it enacted the EPAA, which directed the President to issue regulations governing the pricing and allocation of crude oil and petroleum products. See 15 U.S.C. § 753(a). In Section 4(b)(1) of the original, and amended, EPAA, Congress directed the President to promulgate regulations that would provide for:

(A) protection of public health (including the production of pharmaceuticals), safety and welfare (including maintenance of residential heating, such as individual homes, apartments and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive via-

bility of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers; (E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity; (F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users; (G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of—

(i) fuels, and

(ii) minerals essential to the requirements of the United States,

and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

15 U.S.C. § 753(b)(1)(A)–(L). In setting forth Section 4(b)(1)(F), 15 U.S.C. § 753(b)(1)(F), Congress was particularly concerned with the problem of price discrimination: "The reference to equitable prices in the bill is specifically intended to emphasize that one of the objectives of the mandatory allocation program is to prevent price gouging or price discrimination which might otherwise occur on the basis of current shortages." H.R.Rep.No.93–628, 93rd Cong., 1st Sess., reprinted in [1973] U.S. Code Cong. & Admin.News 2582, at 2702.

Section 4(b)(2) of the EPAA, as originally adopted, specified that the President's regulations should "provide for a dollar-for-dollar passthrough of net increases in the cost of . . . refined petroleum products to all marketers or distributors at the retail level." 15 U.S.C. § 753(b)(2)(A). The purpose of this provision is set forth in the legislative history:

[I]t is contemplated that prices for allocated fuels will be set at levels or pursuant to methods which will permit adequate compensation to assure that private property is not implicitly confiscated by the government. Most importantly, the president must, in exercising his authority, strike an equitable balance between the sometimes conflicting needs of providing adequate inducement for the production of an adequate supply of product and of holding down spiraling consumer costs.

H.R.Rep.No.93–628, 93rd Cong., 1st Sess., reprinted in [1973] U.S.Code Cong. and Admin.News, at 2703. In 1975, this provision was amended to read: "refined petroleum products at all levels of distribution from the producer through the retail level."

Following the passage of the EPAA, in December, 1973, the President created a predecessor agency of the Department of Energy [DOE], and delegated to this agency his authority under the EPAA. See 38 Fed.Reg. 33575 (December 6, 1973). The CLC subsequently delegated its authority under the ESA to this same agency. See 39 Fed.Reg. 24 (January 2, 1974).

In January, 1974, the new agency adopted the CLC's price rules, and published them as the Mandatory Petroleum Price Regulations. See 39 Fed.Reg. 1949 (January 15, 1974). These Regulations laid down guidelines affecting the maximum prices that a refiner could charge for the sale of "covered products", which included crude oil and "special products" such as motor gasoline. See 10 C.F.R. § 212.31, 39 Fed. Reg. at 1950, 1951.

One critical feature of the Regulations was a "price rule." Set forth in 10 C.F.R. § 212.82(a), this rule provided that "[a] refiner may not charge to any class of purchaser a price in excess of the base price" of motor gasoline except under certain specified circumstances. 39 Fed.Reg. at 1952. In this regard, "class of purchaser" was defined as "purchasers . . . to whom a person has charged a comparable price for comparable property or services pursuant to

customary price differentials between these purchasers . . . and other purchasers. . . ." 10 C.F.R. § 212.31, 39 Fed.Reg. at 1950.

As used in the price rule, and in other provisions, "base price" represented the sum of (1) a refiner's weighted average price at which motor gasoline was lawfully priced in transactions with a particular class of purchaser on May 15, 1973; and (2) a refiner's increased "product" costs, or increases in the costs of crude oil and purchased products since May, 1973, 10 C.F.R. § 212.83(b), 39 Fed.Reg. at 1954. 10 C.F.R. § 212.82(f); 39 Fed.Reg. at 1953. Increased "product" costs were determined according to a refiner cost allocation formula. This formula yielded a cents-per-gallon figure referred to as "$d_i{}^u$", which denoted the maximum amount of increased "product" costs that a refiner could apportion to a special product like motor gasoline:

> § 212.83. Allocation of refiner's increased product costs.
>
> \* \* \* \* \* \*
>
> (c) *Allocation of increased-costs—*
>
> \* \* \* \* \* \*
>
> (2) *General formulae:*
>
> \* \* \* \* \* \*
>
> $d_i{}^u$ = the dollar increase that may be applied in the period "u" (the current month) to the May 15, 1973 selling price of [a special product] to each class of purchaser to compute the base price to each class of purchaser.

10 C.F.R. § 212.83(c)(2), 39 Fed.Reg. at 1955.

To the "base price" a refiner could add certain increased "non-product" costs, or increases in the costs of refining and transporting petroleum products that had been incurred since May, 1973. 10 C.F.R. § 212.-83(a) & (b), 39 Fed.Reg. at 1952–53. Under the price rule, this new sum, a "price in excess of base price," could not be recovered by a refiner unless the refiner satisfied certain profit margin limitations and complied with a prenotification procedure that required advance notice of the proposed price increase to the agency for its implicit or explicit approval. 10 C.F.R. §§ 212.-

82(c)(1) & (2)(i), 212.82(i), 39 Fed.Reg. at 1952, 1954. In addition to these restrictions, a refiner could charge for motor gasoline a "price in excess of base price" only if it "equally applied to each class of purchaser" the amount of increased "non-product" costs allocable to that special product. 10 C.F.R. § 212.82(c)(2)(i)(b), 39 Fed.Reg. at 1953.

Another important feature of the Regulations was a "cost bank rule", contained in 10 C.F.R. § 212.83(d)(1), 39 Fed.Reg. at 1956. Because the price rule placed limitations upon the prices that a refiner could charge for special products, such as motor gasoline, occasions arose when a refiner could not recover all its increased "product" costs. The cost bank rule addressed these situations, and permitted a refiner to carry over, or "bank", its unrecovered increased "product" costs for inclusion in the calculation of base prices for motor gasoline in a later month:

> § 212.83. Allocation of refiner's increased product costs.
>
> \* \* \* \* \* \*
>
> (d) *Carryover of costs.* (1) If in any month . . . . a firm charges prices for a special product which result in the recoupment of less total revenues than the entire amount of increased product costs calculated for that product pursuant to the general formula . . . , the amount of increased product costs may be added to the May 15, 1973 selling prices to compute the base prices for that special product for a subsequent month.

Independent retailers operated under a pricing system similar to that scheme imposed upon refiners. In January and February, 1974, however, the agency issued rules permitting independent retailers to increase their retail selling prices for motor gasoline by up to $ .03 per gallon in order to reflect "non-product" costs incurred in the marketing of motor gasoline. *See* 39 Fed. Reg. 809 (January 3, 1974); 39 Fed.Reg. 7795 (February 28, 1974). A refiner could take advantage of this allowance for in-

creased "non-product" costs only if it first satisfied the price rule limitations upon the recovery of a "price in excess of base price." Because of these strictures, refiner-operated stations generally chose not to undertake the burden of increasing motor gasoline prices by $ .03 per gallon. Independent retailers of motor gasoline then had to decide whether to charge an additional $ .03 per gallon above prices charged by refiner-operated stations, and thereby recover their increased "non-product" costs, or to absorb the $ .03 per gallon allowance by selling at prices competitive with those charged by refiner-operated stations.

On April 2, 1974, the agency responded to a "price disparity" that had developed between independent and refiner-operated stations by publishing an amendment to the general refiner cost allocation formula for determining "$d_i^u$", the amount of increased "product" costs:

§ 202.83. Allocation of refiner's increased product costs.

\* \* \* \* \* \*

(c) *Allocation of increased-costs.*

\* \* \* \* \* \*

(2) General formulae:

\* \* \* \* \* \*

$d_i^u$ = The dollar increase that may be applied in the period "u" (the current month) to the May 15, 1973 selling price of [a special product] to each class of purchaser to compute the base price to each class of purchaser, except that the dollar increase that may be applied in the period "u" to the May 15, 1973 selling price of gasoline to compute the base prices to the classes of purchaser which purchase gasoline at retail from a refiner at service stations operated by employees of the refiner may be "$d_i^u$" plus a maximum of $ .03 per gallon of gasoline provided that in computing "$d_i^u$" the numerator of the [general formula] is reduced by an equal amount to the product of the actual amount to cents per gallon increased added to "$d_i^u$" above multiplied by the estimated number of gallons of gasoline to be sold

during the period "u" at retail through service stations operated by employees of the refiner. . . .

10 C.F.R. § 212.83(c)(2), 39 Fed.Reg. 12013–14 (April 2, 1974). According to the agency, this refiner "retail price equalization" rule, or "three cent" rule, "permit[ted] a refiner to allocate an additional three cents of its increased product costs" to gasoline prices charged at refiner-operated stations, "provided that a corresponding reduction in the amount of increased product costs allocated to the price of gasoline sold through independent dealer-operated stations is made." 39 Fed.Reg. at 12013. The agency noted further that while the amendment did "not change the total amount of increased product costs" which a refiner could pass through, it did "permi[t] an adjustment in the allocation of those costs which should result in an equalization of the price charged for gasoline produced by the refiner at the retail level." *Id.* Finally, the agency explained that because the "purpose" of the amendment was "to provide immediate guidance and information . . . and to permit the amendment to be implemented during the month of April," normal rulemaking procedures would be "impracticable" and "good cause" existed for making the amendment effective in less than thirty days. *Id.*

Subsequently, according to the agency, an "ambiguity" became apparent in the Regulations. 39 Fed.Reg. 32307 (September 5, 1974). The ambiguity, the agency stated, could be best understood by reference to a "fundamental" tenet of the Regulations, namely, the "equal application of increased product costs among classes of purchaser." *Id.* As the agency related:

The concept of preserving the customary price differentials that existed as of May 15, 1973 among various classes of purchaser of a particular covered product is fundamental to the . . . system of price regulations, and has been expressed in various . . . rules. Under the refiners' price rules, for example, a formula is provided for determining a uniform cents per gallon increment of increased product

cost which may be applied to the May 15, 1973 selling price to each class of purchaser, in order to determine the base price for that product to that class of purchaser. The base price is the maximum lawful price for the sale of that product to that class of purchaser. The intent of this regulatory framework was to preserve the 'customary price differentials' between purchasers, which, in fact, serve to define 'class of purchaser' in § 212.31, by requiring the application of equal amounts of increased product costs to the May 15, 1973 selling price to each class of purchaser.

*Id.* While observing that, "[i]n general, these regulations have resulted in the equal application of increased product costs among classes of purchaser," the agency cited an "ambiguity" in the Regulations, which was that "sellers are not specifically required actually to charge the prices arrived at under the regulations." *Id.* The agency then specified the problem:

> As an improved supply situation has begun to have a restraining influence on prices, the [agency] has become aware that certain sellers have taken the position that they may selectively 'bank' increased product costs as to certain classes of purchaser, for recoupment in a subsequent month, as long as the prices charged to other classes of purchaser do not exceed the maximum lawful price. Such practices could obviously serve to avoid the intent of the overall framework of the price regulations, and the [agency] is undertaking to insure that these pricing practices are not put into effect.

*Id.*

To remedy this perceived situation, the agency, on September 5, 1974, published an amendment to its cost bank rule regarding the banking of increased "product" costs, effective September 1, 1974. The purposes of the amendment, which issued without a prior opportunity for public comment, were

> to clarify and make explicit the requirement that prices charged for each covered product must reflect the equal application of increased product costs to each

class of purchaser, and that failure to charge prices that reflect equal application of increased product costs except to the extent the seller is precluded from charging such prices by the price term of a contract... will result in unrecouped increased product costs which the seller will not be permitted to recover in a subsequent month.

> \* \* \* \* \* \*

> [to put] all sellers... expressly on notice that prices actually charged, and not merely prices calculated as a lawful maximum, must reflect the equal application of increased product costs, except where a pre-existing contract prevents the implementation of such a price.

*Id.* at 32306–07. As amended, the cost bank rule for special products now included an explicit equal application rule, with a deemed recovery component, and affected both actual and maximum lawful prices:

> § 212.83. Allocation of refiner's increased product costs.

> \* \* \* \* \* \*

> (d) *Carryover of costs.*

> \* \* \* \* \* \*

> (1) \* \* \* With respect to each special product..., when a firm calculates the amount of increased product costs not recouped, which may be added to the May 15, 1973 selling prices to compute the base prices for that special product in a subsequent month, it shall calculate its revenues as though the greatest amount of increased product costs actually added to the May 15, 1973 selling price of that special product and included in the price charged to any class of purchaser, had been added, in the same amount, to the May 15, 1973 selling price of such product and included in the price charged to each class of purchaser; except that, where an equal amount of increased product cost is not included in the price charged to a purchaser because of a price term of a written contract covering the sale of such product which was entered into on or before September 1, 1974, that por-

tion of the increased product costs not included in the price charged to such a purchaser need not be included in the calculation of revenues.

10 C.F.R. § 212.83(d)(1), 39 Fed.Reg. at 32308. In explaining the rule, the agency stated that "[i]n order to make [the] requirement [concerning the equal application of increased product costs in prices actually charged] explicit," it was issuing an amendment to its "banking" provision:

[F]or each product, the recoupment of increased product costs will be calculated on the assumption that the largest amount of increased product cost added to the May 15, 1973 selling price and included in the price charged to any class of purchaser was equally applied to the May 15, 1973 prices and included in the price charged to all classes of purchaser, without regard to whether such prices were in fact charged.

39 Fed.Reg. at 32307. An exception to this rule was where a contract in existence on or before September 1, 1974 required a seller to charge a price less than the price that would reflect the equal application of increased costs. *Id.* In this regard, the agency noted that the amendment to the carryover provisions did not "alter in any respect the ability of a seller to charge prices to all classes of purchaser of a covered product which reflect the application of less than all available increased costs, and to carry forward the amount of increased costs which are not applied for recovery in a subsequent month." *Id.* Instead, the agency stated, the "clarification simply makes explicit the limitation that a seller may not select among classes of purchaser of the same product those classes as to which it will apply increased costs and those classes as to which it will 'bank' increased costs." *Id.* Next explaining that under "[t]his approach, which is implicit in the existing regulations, . . . all sellers continue to be afforded the opportunity . . . to pass through all of their increased product costs," the agency went on to emphasize that

[w]here, however, · a seller chooses to charge prices for a product which reflect

disparate application of increased product costs among classes of purchaser, the carryover of unrecouped increased costs will not be permitted to the extent that any class of purchaser had a lesser amount of increased costs applied to its prices than did another class of purchaser of the same product.

*Id.*

As for the suspension of the usual notice and comment opportunities, the agency announced that it had made a "finding" that an emergency existed which required immediate action. *Id.* at 32307–08. Stating that it had recently learned that "certain sellers have implemented and continue to implement prices which do not conform to the . . . concept of preserving May 15, 1973 price differentials among various classes of purchaser," that the ambiguity in the Regulations made compliance efforts against such sellers more difficult, that a more favorable supply situation had strengthened the incentive not to apply the equal application requirement, and that announcement of the amendment as a mere proposal could draw attention to the ambiguity and prompt sellers to take advantage of the situation, the agency expressed its conclusion that "the continuation or initiation of such practices would be injurious to the public welfare." *Id.* at 32307. The agency then stated that it intended to have public hearings regarding proposed revisions to the Regulations, and that, at that time, it would receive public comments concerning the amendment to the cost bank rule. *Id.* Notice of the proposed hearings, the agency related, would appear "in the near future." *Id.*

The near future arrived on September 10, 1974. On that day, the agency published notice of a proposed "comprehensive revision" of the Regulations. *See* 39 Fed.Reg. 32718 (September 10, 1974). As represented by the agency, the revision was designed "to simplify and clarify the price regulations, while retaining the essential concepts of the regulations as they were initially issued"; "to eliminate regulatory restric-

tions that are no longer needed or are inappropriate in the context of current conditions"; and "to help restore the role of competition within the overall structure of the price regulations, so that traditional market forces may begin to supplant the rigid controls of price regulations as the price setting mechanism." *Id.* The proposed revision included both the elimination of the prenotification requirement regarding the recovery of increased "non-product" costs, and certain "modifications" of the rules governing the equal application of increased product costs, and the recoupment of unrecovered increased product costs. *Id.* at 32718–24.

With respect to the equal application requirement, the agency stated that the Regulations "generally require equal application of increased product costs to the May 15, 1973 prices of each product among all classes of purchaser of that product", and that "[t]his results in a maintenance of the May 15, 1973 price differentials among classes of purchaser of each product from a refiner." *Id.* at 35722. The agency then noted its recent amendment to the cost bank rule, which

clarified... the equal application [requirement] ... to make clear that, to the extent that there is unequal application of... increased product costs in prices actually charged, the difference between the largest amount of increased product cost actually applied to the price charged to any class of purchaser of a product and any lesser amount applied to the price charged to another class of purchaser may not be recouped in a subsequent month, except to the extent that a higher price could not be charged because of a pre-existing written contract.

*Id.* The agency continued by expressing its "aware[ness]" that the equal application requirement "is responsible for an inflexibility in the price regulations which becomes more troublesome and causes more dislocations in the market as supplies of petroleum products increase and there is greater need for the price mechanism to begin to play its customary role in the market." *Id.* at 32722–23.

One of the "principal problem area[s]" caused by the rule's inflexibility, the agency reported, revolved around the nation-wide marketing practices of some refiners, on the one hand, and the regional practices of other, independent marketers, on the other hand:

A refiner marketing on a national basis is required ... to add an equal increment to its May 15, 1973 prices for gasoline throughout the country. It may, however, be competing with regional marketers in one area that have prices on the average that are above its prices, while in another region, the regional marketers may have lower prices. The equal application requirement, in such circumstances, runs counter to the interests of independent regional marketers whose prices are higher than the national refiner's prices, since the national refiner would tend to expand its market at the expense of the higher-priced independent regional refiner in those circumstances.

In effect, a nationwide refiner is unable to adjust its prices on a regional basis and must, as a practical matter, choose an increment of increased product cost to add to its May 15, 1973 prices which results in selling prices that are too high to be competitive in some markets and are too low in other markets.

*Id.* at 32723. The agency then explained the dilemma posed by this state of affairs:

[A]ny relaxation of [the] equal application requirements on an area or regional basis could result in disproportionate pass-through of increased product costs in different regions of the country. On the other hand, there has traditionally been regional price flexibility which serves, among other things, to even out supply among various regions.

*Id.* As a proposed solution, the agency stated that it intended to "modify" the equal application rule so that it would "apply to all classes of purchaser of a product within the same recognized market area", and would "limit the largest increment of increased product costs which [could] be

applied to the price of a product to an amount of increased product costs applied to that product in any other region." *Id.* This modification, the agency explained, would both "help protect the independent sector of the market" and "avoid the possibility of undue regional price disparities." *Id.* The agency then requested comments on whether the limitation on regional price flexibility was necessary, and, if so, whether the suggested ten percent limitation was appropriate. *Id.*

In addition to the problem attending the nation-wide marketing practices of certain refiners, the agency further indicated that an inflexibility inherent in the equal application requirement posed problems at the regional, as well as national, level. *Id.* Two examples were specifically cited by the agency in this regard. The first problem concerned a price disparity resulting from the Regulations' restrictions upon the recovery of increased "non-product" costs:

> [By] applying the same increment of increased product cost to diesel fuel sold at retail as is applied to diesel fuel sold through independent marketers (who have been permitted certain increased non-product cost related price increases), a refiner is very likely to be selling diesel fuel at refiner-owned and operated retail outlets at a lower price than the independent marketer, because the same non-product cost related price increases cannot be implemented by a refiner unless it prenotifies and becomes subject to profit margin limitations.

*Id.* The agency then made an apparent reference to the purpose of the three-cent rule: "A special provision was added to the refiner's cost allocation formula to take this problem into account in sales of gasoline, but the problem remains as to other products." *Id.* The second problem mentioned by the agency centered upon the recovery of increased "product" costs and the situation of particular classes of purchaser:

> [A] refiner's ability to implement price increases which take into account the ability of a class of purchaser to absorb an increase, or to reflect the fact that a class of purchaser was paying atypically

low prices on May 15, 1973, is restricted. Thus, for example, a petrochemical plant or other industrial user of propane may have a May 15, 1973 price for the product that is 3¢ per gallon less than the May 15, 1973 price to wholesale distributors of propane for residential use. Current price regulations preclude an increase in the amount of increased product cost applied to propane sold for industrial use unless an equal increment is applied to the propane sold for residential use.

*Id.* Given these problems, the agency proposed

> to amend the equal application requirement so that different amounts of increased product costs may be added to the prices charged to different classes of purchaser of a product, provided that the amount added to the prices charged to any class of purchaser that includes independent marketers cannot be greater than the amount added to the prices charged to any other class of purchaser of the same product, except to the extent that a refiner is selling to a particular purchaser at a lower price under a pre-existing written contract.

*Id.* The agency explained that it proposed to modify, rather than eliminate, the equal application requirement because the rule "serves to protect the independent sector of the market." *Id.* Finally, the agency requested comments as to whether the amendment would offer sufficient protection to the independent sector, and as to whether other limitations on the application of increased product costs would be required. *Id.*

With respect to the rules concerning the banking of increased product costs, the agency proposed to limit the total amount of increased product costs that could be passed through in any month. *See id.* at 32723–24. The reason for this "modification," the agency stated, was that increased supplies were prompting refiners to sell products at prices reflecting less than a full pass-through of increased product costs and to increase their banks of increased product

costs. *Id.* at 32723. In the event that a shortage situation should occur, the agency explained, there could be marked price increases, because "the maximum lawful prices which refiners could charge under current regulations would include a full pass-through in a single month of all banked costs accumulated over all of the proceeding months." *Id.* The agency believed that a limitation on the size of a refiner's bank would be an appropriate response to this state of affairs.

Following its discussion of the amendments, the agency invited public comments on the proposals, as well as "on aspects of the price regulations which have not specifically been addressed in this notice..." *Id.* at 32725. The agency requested that all comments be received by September 27, 1974, and designated September 30 and October 1, 1974 as hearing dates for the receipt of oral comments concerning the amendments. *Id.*

As published on September 10, 1974, the proposed modification of the equal application requirement appeared as an amendment to the rule governing the refiner's cost allocation computations for increased "product" costs:

§ 212.83. Allocation of refiner's increased costs.

* * * * * *

(c) *Allocation of increased costs* —

(1) *General rule* —(i) *Increased product costs.* In computing base prices for a covered product, a refiner may increase its May 15, 1973 selling price to each class of purchaser each month beginning with November 1973 by an amount to reflect the increased product costs attributable to sales of covered products using the differential between the month of measurement and the month of May, 1973, provided that the amount of increased costs used in computing a base price is calculated by use of the general formula ... and provided that the amount of increased product costs included in computing base prices of a particular covered product must be equally applied to each class of purchaser. In apportioning any

amount of increased product costs to covered products, a refiner may apportion the total amount of increased product costs to a particular covered product in whatever amount it deems appropriate.

(ii) *Increased non-product costs.* In computing allowable prices in excess of base prices for a covered product, a refiner may increase its price above base price to each class of purchaser each month beginning with October 1974 by an amount to reflect the increased non-product costs attributable to sales of covered products in the month of measurement, using the differential between the month of measurement and the month of May, 1973, provided that ... the amount of increased non-product costs included in computing allowable prices above base price of a particular covered product must be equally applied to each class of purchaser. In apportioning any amount of increased non-product costs to covered products, a refiner may apportion the total amount of increased non-product costs to a particular covered product in whatever amount it deems appropriate.

(iii) *Exceptions to equal application rule.* Notwithstanding the provisions of paragraphs (c)(1)(i) and (ii) above, a refiner may comply with the provisions of this paragraph by applying increased costs equally among classes of purchaser within recognized marketing areas, and need not apply increased costs equally among classes of purchaser in different marketing areas, provided that the largest amount of increased product cost applied to the May 15, 1973 selling price of any product in any marketing area shall not exceed by more than 10 percent the amount of increased product cost applied to the May 15, 1973 selling price of that product in any other marketing area; and, further, a refiner may comply with the provisions of this paragraph within any particular marketing area by applying unequal amounts of increased costs among classes of purchaser of a product, provided that no greater amount of increased costs is applied to the May 15,

1973 selling price of any product in sales to any class of purchaser which includes an independent marketer..., than is applied to the May 15, 1973 selling price of that product in sales to all other classes of purchaser in that marketing area. *Id.* at 32727. The cost bank rule was published in a proposed form without a deemed recovery feature:

§ 212.83. *Allocation of refiner's increased costs.*

\* \* \* \* \* \*

(d) *Carryover of costs.* (1) If, in any month beginning with October 1973, and ending with September 1974, a firm charges prices for covered products which result in the recoupment of more or less total revenues than the entire amount of increased product costs calculated pursuant to the general formula and allowable under paragraph (c)(1)(ii) of this section, the excess revenues recouped must be subtracted from the May 15, 1973 selling prices and the amount of increased product costs not recouped may be added to May 15, 1973 selling prices to compute the base prices for covered products in the subsequent month provided that the amount of the increased product cost not recouped and included in computing the base prices of a particular covered product must be equally applied to each class of purchaser.

(2) If, in any month beginning with October 1974, a firm charges prices for covered products which result in the recoupment of more total revenues than the entire amount of increased product costs calculated pursuant to the general formula and allowable under paragraph (c)(1)(ii) of this section, the excess revenues recouped must be subtracted from the May 15, 1973 selling prices to compute base prices for covered products in the subsequent month. If, in any month beginning with October 1974, a firm charges prices for covered products which result in the recoupment of less total revenues than the amount of increased product costs calculated pursuant to the general formula, only the amount of in-

creased product costs not recouped because of lesser sales volumes than were estimated for the current month may be added to the May 15, 1973 selling prices to compute prices for covered products in the subsequent month.

*Id.* at 32728–29.

Subsequent to the September 10, 1974 notice, the agency in fact received oral and written comments regarding revisions of the Regulations. Thereafter, on December 5, 1974, the agency published several final amendments to the Regulations concerning the pass-through of increased "non-product" costs, effective December 1, 1974. *See* 39 Fed.Reg. 42368 (December 5, 1974). With respect to "all other revisions to the price regulations proposed in the September 10 notice", the agency stated that it was deferring action "until a later date", while keeping the matters "under active consideration." *Id.* In this regard, the agency, without any discussion in the preamble, published as a final amendment a cost bank rule, applicable to increased "product" costs, with a deemed recovery component:

§ 212.83 Allocation of refiner's increased costs.

\* \* \* \* \* \*

(e) *Carryover of costs.* (1) If in any month beginning with October 1973, a firm charges prices for a special product which result in the recoupment of less total revenues than the entire amount of increased product costs calculated for that product pursuant to the general formula and allowable under paragraph (c)(1)(i) of this section and that unused amount of increased costs is not used to increase May 15, 1973 selling prices pursuant to paragraph (c)(1)(ii) of this section, the amount of increased product cost not recouped may be added to the May 15, 1973 selling prices to compute the base prices for that special product for a subsequent month.... With respect to each special product, ... when a firm calculates the amount of increased product cost not recouped, which may be added to the May 15, 1973 selling

prices to compute the base prices for that special product in a subsequent month, it shall calculate its revenues as though the greatest amount of increased product costs actually added to any May 15, 1973 selling price of that special product and included in the price charged to any class of purchaser, had been added, in the same amount, to the May 15, 1973 selling price of that special [prod]uct and included in the price charged to each class of purchaser; except that, where an equal amount of increased product cost is not included in the price charged to a purchaser because of a price term of a written contract covering the sale of such product, which was entered into on or before September 1, 1974, that portion of the increased product costs not included in the price charged to such a purchaser need not be included in the calculation of revenues. If in any month beginning with October 1973, a firm charges prices for a special product which result in the recoupment of more total revenues than the entire amount of increased product costs calculated for that product pursuant to the general formula and allowable under paragraph (c)(1)(i) of [this] section, the amount of excess product costs recouped must be subtracted from the May 15, 1973 selling prices to compute the base prices for that special product for the subsequent month.

10 C.F.R. § 212.83(e)(1), 39 Fed.Reg. at 42372 (December 5, 1974).

Additional final amendments were published on December 24, 1975, 39 Fed.Reg. 44407, on January 16, 1975, 40 Fed.Reg. 2795, and on August 29, 1975, 40 Fed.Reg. 39850. As with the December 5, 1974 changes, the amendments addressed matters unrelated to the equal application and deemed recovery rules pertaining to motor gasoline. Moreover, the agency continued to defer formal consideration of the revisions proposed in the September 10 notice of proposed rulemaking.

On October 22, 1975, the agency issued a notice of proposed rulemaking on the question of whether the Regulations should, *inter alia,* "permit limited regional pricing by refiners, resellers, and retailers." 40 Fed. Reg. 49372 (October 22, 1975). In the notice, the agency first explained that the amendment as proposed on September 10, 1974, to allow regional exceptions from the equal application requirement had not been adopted because of fears that the changes might result in higher prices, especially for home heating oil, and because of perceived administrative problems in implementing the changes. *Id.* The agency, however, stated that it "continue[d] to be of the view that at least a limited amount of regional pricing flexibility should be permitted, as an essential step toward reducing the rigidity of the pricing regulation . . . ." *Id.* The agency then proposed to issue a regional price rule that would allow a differential among regions of up to two cents per gallon in the amount of costs used to determine the selling price of covered products and requested comments on whether the differential was an appropriate amount. *Id.* at 49372–73. In addition, the agency proposed to allow "regional price flexibility on a product-by-product basis", thus permitting flexibility for gasoline, for example, but not for certain oils. *Id.* at 49373. With respect to both proposals, the principal issue confronted by the agency, it appears, concerned "the definition of the 'region' within which equal application of increased costs will continue to be required." *Id.* The agency hence specifically requested comments on the definition of "region", as well as on the general matter of regional pricing. *Id.* Meanwhile, the proposed rule read:

§ 212.83 Allocation of refiner's increased costs.

\* \* \* \* \* \*

(c) *Allocation of increased product costs —*

(1) *General rule.*—(i) *No. 2 oils and gasoline.* In computing base prices for sales of No. 2 oils and gasoline, a refiner may increase its May 15, 1973 selling

price to each class of purchaser each calendar month beginning with November 1973 by an amount to reflect the increased product costs attributable to sales of that covered product using the differential between the month of measurement and the month of May, 1973, provided that the amount of increased costs used in computing a base price is calculated by use of the formula set forth in paragraph (c)(2)(i) of this section, and that the formula of paragraph (c)(2)(i) of this section is computed separately for No. 2 oils and for gasoline, and that the amount of increased product costs included in computing base prices of No. 2 oils and of gasoline is equally applied to each class of purchaser.

* * * * * *

(v) *Regional pricing exemption to the equal application rule.* A refiner may comply with the provisions of § 212.-83(c)(1)... as to No. 2 oils, gasoline, and each particular general refinery product by applying increased costs equally among classes of purchaser of each product within each region, and need not apply increased product costs equally among classes of purchaser of each product in different regions provided that the largest amount of increased product cost applied to the May 15, 1973 selling price of any product in any region shall not exceed by more than two cents per gallon the amount of increased product cost applied to the May 15, 1973 selling price of that product in any other region.

*Id.* at 49374–75.

Following subsequent public hearings and comments on this issue of regional price flexibility, the agency on July 21, 1976, published a final rule amending 10 C.F.R. § 212.83(h):

(h) *Equal application among classes of purchaser —*
(1) *General rule.* Except as provided in subparagrap[h] (2) of this paragraph, when a firm calculates the amount of increased costs not recouped that may be added to May 15, 1973, selling prices to compute maximum allowable prices in a subsequent month, it shall calculate its revenues as though the greatest amount of increased costs actually added to any May 15, 1973 selling price of the product concerned and included in the price charged to any class of purchaser, had been added, in the same amount, to the May 15, 1973, selling prices of that product and included in the price charged to each class of purchaser.

(2) *Special rule.*—(i) *Gasoline.* When a firm calculates the amount of increased costs not recouped that may be added to May 15, 1973, selling prices of gasoline to compute maximum allowable prices in a subsequent month, it may, notwithstanding the general rule in subparagraph (1) above, compute revenues as though (A) the greatest amount of increased costs actually added to any May 15, 1973, selling price of gasoline and included in the price charged to any class of purchaser in a particular region (as defined in § 212.-82), had been added, in the same amount, to the May 15, 1973, selling prices of that product and included in the price charged to each class of purchaser in that region, and (B) the greatest amount of increased costs actually added to the May 15, 1973, selling price of gasoline and included in the price charged to any class of purchaser in any region had been added, in the same amount (less any actual differential or three cents per gallon, whichever is less) to the May 15, 1973, selling prices of that product and included in the price charged to any class of purchaser in any other region.

(3) *Exceptions.* (i) Where an equal amount of increased costs is not included in the price charged to a purchaser because of a price term of a written contract covering the sale of the product concerned that was entered into on or before September 1, 1974, that portion of the increased costs not included in the price charged to that purchaser need not be included in the calculation of revenues as otherwise required by subparagraph (1) or (2) above.

41 Fed.Reg. 30024–25 (July 21, 1976). As the agency explained, the former equal application rule had been interpreted as preventing the "banking" of costs where a refiner had engaged in unequal intra- and inter-class pricing. *Id.* at 30021. Such an interpretation, according to the agency, had "resulted in selling prices which are either too high or too low to be competitive in many instances, where a refiner marketing on a national basis is in competition with regional local marketers." *Id.* The new amendment would modify this rule to permit, without a deemed recovery "penalty", the unequal application of increased costs among regions defined by PAD (Petroleum Administration Defense) districts:

> [A] refiner marketing on a national basis, or one marketing in more than one PAD district, may, without penalty as to the carry-forward of unrecouped costs ..., pass through increased costs to a class of purchaser of gasoline located in one PAD district in amounts which exceed by not more than 3 cents per gallon the amount of increased costs passed through to any class of purchaser of gasoline located in any other PAD district.

*Id. See id.* at 30023. Moreover, the agency noted that "[b]ecause the members of classes of purchasers are not necessarily confined to a single PAD district," refiners would be able to charge varying prices within a class, so long as the prices were not violative of the "normal business practice" policy of 10 C.F.R. § 210.62(b). *Id.* Hence, the agency observed, "the '3-cent rule' adopted today applies with respect to intra-class price variations, as well as to price variations between classes of purchaser, which are instituted pursuant to today's amendments." *Id.*

On January 27, 1977, the agency published various amendments affecting the pricing of gasoline. One change modified the definition of "$d_i^u$", altering it from a cents per gallon figure to a total dollar amount of increased costs that a refiner could recover through sales:

> § 212.83 Price Rule
>
> \* \* \* \* \* \*

(c) *Allocation of increased costs.*

> \* \* \* \* \* \*

> $d_i^u$ = The total dollar amount a refiner may apportion in the period "u" to ... gasoline....

10 C.F.R. § 212.83(c)(2). *See* 42 Fed.Reg. 5030, 5031 (January 27, 1977). Conspicuously absent from this amendment was the "three cent" retail price equalization rule, which had been an express feature of the former rule.

On May 5, 1977, the agency issued a "corrective amendment" to the Price Rule:

> § 212.83 Price Rule
>
> \* \* \* \* \* \*

> (h) *Equal Application among classes of purchaser* \* \* \*
>
> (2) *Special Rules* \* \* \*
>
> (iv) *Retail sales of gasoline by refiners.* When a refiner calculates the amount of increased costs not recouped that may be added to May 15, 1973, selling prices of gasoline to compute maximum allowable prices in a subsequent month, it may, notwithstanding the general rule in paragraph (b)(1) of this section, compute revenues as though (A) the greatest amount of increased costs actually added to any May 15, 1973, selling price of gasoline and included in the price charged to any class of purchaser that purchases gasoline at retail from a refiner at any service station operated by employees of the refiner had been added to the May 15, 1973, selling prices of that product and included in the price charged to each class of purchaser that purchases gasoline at retail from a refiner at any service station operated by employees of the refiner and (B) the greatest amount of increased costs actually added to the May 15, 1973, selling price of gasoline and included in the price charged to any class of purchaser that purchases gasoline at retail from a refiner at any service station operated by employees of the refiner had been added, in the same amount (less any actual differential or three cents per gallon,

whichever is less) to the May 15, 1973 selling prices of gasoline and included in the price charged to all other classes of purchaser.

10 C.F.R. § 212.83(h)(2)(iv), 42 Fed.Reg. 22882 (May 5, 1977). In its discussion of the changed rule, the agency stated that the amendment "merely replaces a provision inadvertently omitted" in January, 1977, that had been "previously found in the definition of '$d_i{}^u$'" and that "permits a refiner to add three cents more of increased costs to the prices of gasoline sold at retail by employees of the refiner than that refiner adds to the prices of gasoline sold at other levels of distribution." *Id.* at 22881. Moreover, the agency explained that the amendment served to clarify the equal application and deemed recovery requirements:

> This amendment makes explicit the requirement that the equal application rule continues to apply to sales of gasoline at retail by a refiner, that is, that recovery of increased costs by refiners is computed as though the greatest amount of increased costs included in the selling price to any class of purchaser that purchases gasoline at retail from a refiner had been included in the selling price to all such classes of purchaser. This requirement was implicit in the earlier definition of "$d_i{}^u$" and does not represent a change from the earlier provision.

*Id.* As for the placement of the amendment, the agency stated that the provision "more appropriately appertains to the topic of § 212.83(h)", and that "reinsertion" in § 212.83(c)(2) would be "awkward". *Id.* The agency noted further that "no substantive change is involved or intended by this change in placement," and indicated that because the amendment was "only to correct an inadvertant omission", "good cause" existed to issue the amendment without notice and opportunity for comment. *Id.* Finally, the agency asserted that the amendment "merely restores the regulations to their previous status, and is not intended to change their effect." *Id.*

In January, 1979, Mobil commenced the instant action, contesting the validity of the "new" three cent rule, as published on May 5, 1977, and, alternatively, the validity of the equal application rule with the deemed recovery component, as published on September 5, 1974. In the ensuing months, Exxon, Gulf, and Marathon joined as plaintiff-intervenors.

Subsequently, the agency expressed an opinion that the equal application requirement posed certain problems in the context of "banking": "The . . . rule . . . in some instances may cause certain refiners . . . to maintain a selling price in retail sales of gasoline well below those of independent retailers and well below those that would prevail in a competitive marketplace." 44 Fed.Reg. 54902 (September 21, 1979). To meet this problem, the agency proposed to amend § 212.83(h) to permit refiners to increase from 3 cents to 7.9 cents the maximum cents per gallon differential. *Id.* at 54902, 54905–06.

On April 29, 1980, the agency published an amendment to § 212.83(h), raising the cents per gallon differential to 8.6 cents. 45 Fed.Reg. at 28303–04 (April 29, 1980). At this time, the agency observed again that "the equal application rule is causing refiners . . . to sell gasoline in retail sales at prices substantially below those of independent retailers and those that exist in the current competitive marketplace", thus creating "serious competitive imbalances in current retail markets." *Id.* at 28303. In this regard, the agency reported that refiners had indicated in comments concerning the amendment that they "may not be able to take full advantage of the [new rule] since within the retail sales category they would still be deemed to recoup any increase in one retail sale on all other retail sales." *Id.* at 28302. The agency then expressed its intent to issue a notice of proposed rulemaking "regarding further amendments to the equal application rule." *Id.* at 28303.

In June, 1980, the agency instituted rulemaking proceedings in regard to a proposal to eliminate the equal application rule. 45 Fed.Reg. 44238 (June 30, 1980). In the notice, the agency remarked that the rule

had protected various classes of purchaser by requiring that increased costs "be allocated equally to each class of purchaser and within each class of purchaser", and that the rule had helped "to maintain the historical differentials in prices between and among classes of purchasers in order to ensure that petroleum products are distributed at equitable prices." *Id.* at 44239. Nonetheless, the agency stated that it was considering modifying or eliminating the rule "in light of current needs and requirements," "because, while maintaining historical differentials ensures equitable prices for a certain period of time, at some point a change in society, the economy, and the petroleum market could make the historical differentials inequitable and anomalous." *Id.* Additionally, the agency noted that an equal application rule for refiners seemed to be "an anomaly", particularly at the retail level, inasmuch as changes in certain price rules had resulted in the effective elimination of an equal application rule applicable to retailers and to most resellers and reseller-retailers. *Id.* Moreover, the agency indicated that because "the equal application rule tends to discourage the imposition of significant price differentials among similarly situated customers and therefore may reduce the pricing flexibility of those subject to it", and because it was contemplated that gasoline would be decontrolled "as soon as market conditions allow", "modifications to or elimination of the equal application rule" were being considered as possible means of "introduc[ing] a greater degree of pricing flexibility and market competition." *Id.* In this regard, the agency remarked that "[i]n a regime of full scale and pervasive controls, . . . a reduction in pricing flexibility may be justified, because the conditions that make pervasive controls necessary suggest that free market competition is inadequate to allocate products equitably at equitable prices." *Id.* The agency "conclu[ded]", however, that "at this time and given the current and projected petroleum stocks, and decreased demand, allocation of increased costs by market forces will result in equitable pricing, while at the same time furthering the EPAA objective of minimizing unnecessary interference with market mechanisms." *Id.*

The agency went on to propose, first, an amendment of the equal application rule, with its deemed recovery feature, that would exempt retail sales of gasoline from the rule. *See id.* at 44239, 44241, 44243. Such an amendment, the agency explained, "would not increase the total amount of allowable increased costs that could be passed through", inasmuch as costs assessed at retail would "result in a reduction in the allowable increased costs available for use at other marketing levels or in the firm's banks". *Id.* at 44239, 44243. Also, the agency stated, the amendment "would permit refiners . . . to allocate their increased costs in a different and more flexible manner", *id.* at 44239, 44243, and would remove a "regulatory-induced incentive for refiners . . . to undercut their independent competition", *id.* at 44240. Anti-trust laws, or other legislation, the agency asserted, would deal with any predatory pricing practices that could aversely impact the independent sector. *Id.* at 44240. As an alternative to this proposed amendment, the agency suggested (1) the total elimination of the equal application rule at both wholesale and retail levels; (2) the elimination of the equal application rule at the retail level, only to the extent that the amount of increased costs added to retail selling prices of gasoline is equal to or greater than the weighted average amount of increased costs added to selling prices of gasoline at wholesale; or (3) the elimination of the equal application rule at both wholesale and retail levels, only to the extent that the amount of increased costs added to retail selling prices of gasoline is equal to or greater than the weighted average amount of increased costs added to selling prices of gasoline at wholesale. *Id.* at 44240, 44241–43.

Following public hearings on the matter, the agency, on November 5, 1980, adopted a final rule deleting the equal application rule with respect to all sales of gasoline. 45 Fed.Reg. 72626 (November 3, 1980). In its published form, the new rule provided:

§ 212.83 Price rule

\* \* \* \* \* \*

(h) *Equal application among classes of purchaser.*

(2) *Special rules.*—(i) *Gasoline.* All sales of gasoline are exempt from the provisions of this paragraph.

10 C.F.R. § 212.83(h)(2)(i), 45 Fed.Reg. at 72630. In discussing the change, the agency stated that the equal application rule had "created a disincentive for refiners to increase any retail sale price unless every retail price could be raised", because the deemed recovery rule applied within a class of purchaser as well as between classes of purchaser." *Id.* at 72627. The agency observed also that deletion of the rule would afford refiners "the pricing flexibility to recoup increased costs allocated to gasoline as they deem appropriate"; would "foste[r] competition in the market place generally, minimiz[e] regulatory interference with market mechanisms, and promot[e] economic efficiency"; and would, "in the long run", benefit the consumer as well as the industry. *Id.* at 72628. The agency emphasized, however, that in eliminating the rule, it was "specifically reject[ing] suggestions made by some refiners that the equal application rule was always inappropriate." *Id.* On this point, the agency stated: "DOE continues to believe that maintenance of historical price differentials in the pass-through of increased costs is in a supply shortage the most appropriate means, if not the *only* means, of ensuring equitable pricing, a specific purpose of the EPAA." *Id.* Additionally, the agency expressed its belief that "the adequate supply environment and the competitive marketplace will provide the primary safeguard against anticompetitive pricing by refiners", noting that comments of the Antitrust Division of the Department of Justice had supported the elimination of the equal application rule. *Id.* Finally, the agency observed that in the notice of proposed rulemaking,

> we suggested that it was our tentative belief that the equal application rule created a regulatory inducement for refiners both to undersell independent competitors in certain situations and not to reduce prices to marketers to meet price competition in other situations, and that

this inducement could have serious long-term effects on the independent sector of the industry.

*Id.* at 72628–29. Upon consideration of the rulemaking record, however, the agency stated that it had determined that there was "n[o] ... support" in the record for the conclusion that the equal application rule harmed the independent sector, and thus rejected its tentative belief as "unfounded". *Id.* at 72629. In emphasizing that its deletion of the equal application rule was "not based on any determination that such elimination is necessary to aid the independent sector of the market", the agency explained that, as noted by both independent marketers and refiners, and by the DOE Office of Special Counsel, "most of the current petroleum product price disparities can be attributed to the crude oil-cost disparities between refiners, not the equal application rule." *Id.* at 72629.

After all this regulatory activity, on January 30, 1981, President Reagan published Executive Order No. 12287, which abolished the Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212. 46 Fed.Reg. 9909 (January 30, 1981).

## II.

Before addressing the merits of the parties' motions, it is necessary to come to terms with a point of dispute among the parties concerning the subject matter of this lawsuit.

The plaintiffs contend that the controversy before the Court centers upon the nature and scope of the May 5, 1977, three cent rule, because prior to May 5, 1977, recoveries under the original three cent rule that were passed through in actual selling prices below base prices had been exempt from any equal application penalty. On this point, the plaintiffs seek a declaration that the original three cent rule permitted refiners to apply, without penalty, unequal increased cost increment to actual motor gasoline prices below base prices charged to firms in the class of refiner-operated stations; that the September 5, 1974, deemed

recovery rule was not applicable to recoveries from refiner-operated stations under the three cent rule; and that the May 5, 1977 three cent rule was unlawfully promulgated. Alternatively, if this Court were to declare the May 5, 1977 three cent rule to be valid, the plaintiffs seek a declaration that the September 5, 1974 deemed recovery rule was procedurally and substantively invalid.

The defendants, on the other hand, argue that the plaintiffs' grievance is with the requirement that the unequal application of increased product costs in actual sale prices below base prices of motor gasoline through refiner-operated stations falls within the reach of a deemed recovery rule. If such a requirement existed prior to the January 27, 1977, deletion of the three cent rule, then the May 5, 1977 three cent rule, the defendants argue, would be procedurally valid under the interpretive rule exception to rule-making requirements, irrespective of where the "new" rule was positioned in the Regulations. If there were no preexisting requirement, the defendants accept the plaintiffs' contention that reinsertion of the May 5, 1977, three cent rule as part of the deemed recovery rule was procedurally deficient. In this regard, the defendants assert that beginning with the September 5, 1974, deemed recovery rule, all recoveries under the three cent rule were subject to a cost recovery penalty. Accordingly, the defendants seek a declaration that the September 5, 1974, equal application rule, with its deemed recovery component, was procedurally and substantively valid.

The disagreement among the parties stems, in part, from the agency's statement in the May 5, 1977, preamble that the equal application and deemed recovery rules "[were] implicit in the earlier definition of '$d_i^u$'." 42 Fed.Reg. at 22881 (May 5, 1977). The plaintiffs have construed this language as meaning that the April 4, 1974 three cent rule contained an equal application requirement, with a deemed recovery component, which pertained to actual sale prices at refiner-operated stations. The defendants, however, argue that it was the promulgation of the September 5, 1974 rule that

brought the unequal application of costs in actual sales to the group of refiner-operated stations within the scope of a deemed recovery penalty; that no regulation in effect in April, 1974, expressly addressed the issue of whether refiners could unequally apply the three cent differential in actual selling prices below base prices, and, if so, whether refiners could do so between individual stations; and that the cited language in the May 5, 1977 preamble referred to the April, 1974 definition of "$d_i^u$" as implicitly modified by the September 5, 1974 rule.

Despite this difference of opinion, both parties appear to accept the proposition that the procedural validity of the May 5, 1977 three cent rule turns upon the agency's assertion that the rule did not effect a substantive change in the Regulations. Given this common ground, in order to determine whether a substantive change in fact occurred, it is useful to consider the scope and effect of both the original three cent rule and the September 5, 1974 equal application rule, with its deemed recovery component.

At this juncture, the defendants raise the objection that the plaintiffs' action is barred by the doctrine of laches. Inasmuch as the focus of this action is upon the May 5, 1977 three cent rule, and in view of the relatively brief period of time between the issuance of the rule and the commencement of this action, and the plaintiffs' efforts to seek clarification of the rule prior to filing suit, this Court is not inclined to dismiss this action on the ground of laches.

### A.

In support of their contention that the original three cent rule gave refiners flexibility in passing-through increased product costs in actual retail prices at refiner-operated stations, the plaintiffs assert that the rule only pertained to the computation of base prices and not to the computation of actual prices below base prices; that the rule did not require refiners to charge uniform base prices or uniform selling prices below base prices; that the rule permitted

refiners to pass-through unequal increased product cost increments in retail sales; that no deemed cost recovery penalty inhered in the original rule; and that an equal application requirement or a deemed recovery penalty affecting actual selling prices at refiner-operated stations would be inconsistent with the purpose of the original three-cent rule, which was to equalize prices between independents and refiners according to individual market conditions.

The defendants share the plaintiffs' views that the original rule concerned base prices, and that the rule set forth no explicit requirement that refiners charge equal increments of increased product costs where selling prices were below base prices, or else be subject to a cost recovery penalty. The defendants argue further, however, that the original three cent rule sanctioned unequal increased product cost increments in base prices only as between retail purchasers of gasoline at refiner-operated stations and all other sales, and disallowed unequal increased product cost increments in base prices among retail purchasers at refiner-operated stations.

Examining the language of the original three cent rule, the general provision provides that a refiner "may" apply "the" dollar increase, or $d_i^u$ increment to the May 15, 1974 selling price of motor gasoline "to each class" to determine the base price "to each class." The exception to this general provision provides that "the" dollar increase that a refiner "may" apply to the May 15, 1973 selling price of motor gasoline to determine "the base prices to the classes" of retail purchasers at refiner-operated stations "may" be $d_i^u$ plus three cents per gallon, so long as a refiner deducts from the formula used to arrive at the $d_i^u$ increment a sum represented by "the actual amount of cents per gallon increase added to $d_i^u$ ... multiplied by the estimated number of gallons ... to be sold" during the relevant time period at retail at refiner-operated stations.

■ Several conclusions may be drawn from this language. For example, as all parties recognize, the rule refers only to the computation of base prices, not to the computation of actual selling prices below base prices. Moreover, the usage of the word "may" in both the general provision and the exception suggest that a refiner could exercise its discretion in determining the amount of increased product costs to pass-through in calculating base prices. In this regard, the Temporary Emergency Court of Appeals [TECA] has indicated that under the base price rules, a refiner was not required to add *all* increased product costs arrived at under the general formula in determining base prices; that a refiner could vary its base prices according to the amount of increased product costs applied to May 15, 1973 selling prices; and that the sum represented by adding all increased product costs calculated under the formula to the May 15, 1973 selling price was the maximum allowable base price, rather than the only base price. *See Standard Oil Company v. DOE,* 596 F.2d 1029, 1040–45 (Em. App.1978). This decision of TECA appears to dispose of any claim that under the general provision, the same increased product cost increment had to be applied in determining base prices to various classes. As for the exception, it appears that a refiner was also not required to apply equal increased product cost increments to retail prices at refiner-operated stations. Certainly the permissive nature of the rule, which allowed a refiner to pass through "a maximum" of three cents per gallon, implies that no uniform increment was required to be imposed. The preamble conveys a similar impression. *See* 39 Fed.Reg. at 12013 (April 2, 1974). More importantly, the language of the exception seems to paraphrase and relate back to the language of the general provision, indicating that, within the three cents per gallon limitation, the pass-through of increased product costs among refiner-operated stations is left to the refiners' discretion. Because the agency's contrary positions, *see, e.g.,* Interp. 78–53 [Mobil Oil Corp.], 43 Fed.Reg. 40207 (September 11, 1978); Interp. 78–36 [Atlantic Richfield Co.], Enf.Man. (CCH) ¶ 56,427, at 56,583–84 (July 10, 1978); Interp. 75–5 [Phillips Petroleum Co.], Enf.Man. (CCH), ¶ 56,246, at 56,266 (February 14, 1975),

*aff'd,* 2 FEA ¶ 80,599 (May 30, 1975); 39 Fed.Reg. at 32722, 32723 (September 10, 1974); 39 Fed.Reg. at 32307 (September 5, 1974), cannot be reasonably harmonized with the language of the original three cent rule, they are entitled to little weight. *See, e.g., United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965); *Pennzoil Co. v. DOE,* 680 F.2d 156 at 173 n.27 (Em.App.1982); *Wiggins Brothers Inc. v. DOE,* 667 F.2d 77, 88 (Em.App.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *Koch Refining Co. v. DOE,* 658 F.2d 799, 803 (Em.App.1981); *UPG, Inc. v. Edwards,* 647 F.2d 147, 156–58 (Em.App.1981); *Standard Oil Co. v. DOE,* 596 F.2d at 1055–56; *Perine v. William Norton & Co.,* 509 F.2d 114, 120 (2d Cir. 1974).

The Court shall now examine the September 5, 1974 equal application rule in light of this construction of the original three cent rule.

### B.

■ In their challenge to the operation of the September 5, 1974 rule, the plaintiffs assert that the actual dollar amount of costs recovered under the three cent rule would be subtracted from the amount of increased product costs otherwise available for recovery, such that it was the $d_i^u$ increment, and not the three cent rule allowance, that would be equally applied under the September 5, 1974 rule. Additionally, the plaintiffs contend that, in any event, the September 5, 1974 equal application rule, with the deemed recovery component, was procedurally and substantively invalid. With respect to this latter issue, the plaintiffs argue that the defendants are collaterally estopped by the decision in *Lakes Gas Co. v. DOE,* 477 F.Supp. 187 (D.Minn.1979), *reaffirmed in Western Petroleum Co. v. DOE,* CV 3–80–626 (D.Minn. March 20, 1981), from relitigating the procedural validity of the rule. Because of the defendants' representations concerning the presentation of this issue to the *Lakes Gas* Court, this Court shall decline to apply the doctrine of offensive collateral estoppel.

In response to the plaintiffs' arguments, the defendants assert that the September 5, 1974 rule, by its own terms, applied to recoveries of *all* increased product costs passed through in actual selling prices below base prices. As for the lawfulness of the rule, the defendants contend that the rule was procedurally valid under the "good cause" exception to the requirement of rule-making proceedings, and that the rule was substantively valid under the EPAA.

It is true, as asserted by the defendants, that insofar as the September 5, 1974 rule referred to "increased product costs," it did not expressly exempt recoveries under the original three cent rule. There is also some merit, however, to the plaintiffs' position that the September 5, 1974 rule did not affect recoveries under the three cent rule, to the extent that under the terms of the original three cent rule, such recoveries were not included in the final $d_i^u$ amount of increased product costs.

Because this Court must conclude that the September 5, 1974 rule was procedurally invalid, it becomes unnecessary to resolve this dispute over the operation of the agency's formula for the calculation of increased product costs.

■ Both Section 4 of the APA, 5 U.S.C. § 553(b)(B), and Section 7 of the Federal Energy Administration Act [FEAA], 15 U.S.C. § 766(i)(B)(1974), *repealed,* Department of Energy Organization Act, § 709 (1977), permitted the agency to promulgate a regulation without prior notice and comment where good cause existed. Section 4 of the APA provides that the requirement of prior notice does not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). Section 7 of the FEAA allowed the agency to waive the requirements or prior notice and comment "where strict compliance is found to cause serious harm or injury to the

public health, safety, or welfare, and such finding is set out in detail in such rule, regulation, or order." 15 U.S.C. § 766(i)(B).

Under the APA, courts have "reluctantly countenanced," *New Jersey v. EPA,* 626 F.2d 1038, 1045–46 (D.C.Cir.1980), and narrowly construed the good cause exception. *See, e.g., Kollett v. Harris,* 619 F.2d 134, 145 (1st Cir. 1980); *Sharon Steel Corp. v. EPA,* 597 F.2d 377, 379–80 (3rd Cir. 1979); *U. S. Steel v. EPA,* 595 F.2d 207, 214 (5th Cir.), *clarified on other grounds,* 598 F.2d 915 (5th Cir. 1979); *National Nutritional Foods Ass'n v. Kennedy,* 572 F.2d 377, 384 (2d Cir. 1978); *American Iron & Steel Inst. v. EPA,* 568 F.2d at 292. Such cautious approaches to the "good cause" exception find ample support in the legislative history surrounding the APA:

> "Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. "Unnecessary" means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved. "Public interest" supplements the terms "impracticable" or "unnecessary;" it requires that public rule-making procedures shall not prevent an agency from operating, and that, on the other hand, lack of public interest in rule-making warrants an agency to dispense with public procedure.

S.Rep.No.752, 79th Cong., 1st Sess., at 16 (1945). *See* S.Rep.No.248, 79th Cong., 2d Sess., at 200 (1946); Attorney General's Manual on the Administrative Procedure Act, at 12–13 (1947).

■ Because of the narrow scope of the "good cause" exception, it is insufficient for an agency merely to state that good cause exists. *See, e.g., Mobil Oil Corp. v. DOE,* 610 F.2d 796, 803 (Em.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). It is sufficient, however, if a recital of good cause is justified by obvious and compelling facts that can be judicially noticed. *See, e.g., Shimek v.*

*DOE,* 685 F.2d 1372 at 1374–1375 (Em.App. 1981); *Kollett v. Harris,* 619 F.2d at 144–45; *National Helium Corp. v. FEA,* 569 F.2d 1137, 1141–46 (Em.App.1977); *Nader v. Sawhill,* 514 F.2d 1064, 1068–69 (Em.App. 1975); *Reeves v. Simon,* 507 F.2d 455, 458–59 (Em.App.1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975); *California v. Simon,* 504 F.2d 430, 439 (Em. App.1974), *cert. denied sub nom. California v. Sawhill,* 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974); *DeRieux v. The Five Smiths Inc.,* 499 F.2d 1321, 1332–33 (Em. App.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974).

■ The FEAA "good cause" exception was also narrowly construed. As evidenced by the legislative history of the FEAA, Congress intended that the agency would use this exception "very sparingly." Conference Rep.No.93–788, 93rd Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, 2939 at 2977. Like the practice under the APA, in order to invoke the FEAA provision, the agency had to make a published, or unpublished, finding of good cause. *See, e.g., Standard Oil Co. v. DOE,* 596 F.2d at 1062.

Examining the September 5, 1974 rule under the APA standards, it appears from the preamble, and from the agency's present discussion of the market conditions surrounding the promulgation of the September 5, 1974 rule, that the basis for the assertion of "good cause" was a perception that an ambiguity in the Regulations could result or had resulted in selective banking and discriminatory pricing against independents and various geographic regions, and that agency action was necessary to insure that such pricing practices were not put into effect or continued. 39 Fed.Reg. at 32307 (September 5, 1974). This ambiguity, the agency believed, had been highlighted by an increased supply situation in 1974 which had contributed to a decline in selling prices. According to the defendants, this change in the supply situation had prompted the agency to reevaluate its entire regulatory scheme in mid-1974. Under these circumstances, the defendants continue, the

September 5, 1974 rule was promulgated as soon as it reasonably could have been.

█ Although the eradication of discriminatory pricing practices is an important aim of the regulatory system, it does not follow that the mere existence of such practices, without more, invariably provides justification for issuing rules under the "good cause" exception. To maintain that an agency action in furtherance of regulatory objectives amounts to "good cause" would be to engraft the general rulemaking requirements onto the exception. In order to have warranted the suspension of normal rulemaking procedures under the "good cause" exception, there must have been some type of exigency. Here, there was no compelling circumstances surrounding the discriminatory pricing practices cited by the agency. No users had been totally deprived of a supply of motor gasoline, no violence had surfaced or appeared imminent, and, more importantly, no sudden, disruptive change appears to have occurred with respect to either the distribution or pricing of motor gasoline on or about the time the September 5, 1974 rule had issued. *See, e.g.* *U. S. Steel v. EPA,* 595 F.2d at 214 n.15; *Reeves v. Simon,* 507 F.2d at 459; *California v. Simon,* 504 F.2d at 440 n.30.

The Court thus concludes that because it issued without good cause, the September 5, 1974 rule was procedurally invalid, and without effect upon recoveries under the original three cent rule. It therefore becomes unnecessary to consider the other challenges to the validity of the September 5, 1974 rule.

### C.

The defendants go on to assert, in the alternative, that an equal application rule with a deemed recovery component was validly repromulgated in a rulemaking that commenced on September 10, 1974, and concluded on December 5, 1974. In support of this contention, the defendants claim that the September 10 notice of proposed rulemaking invited comments on the requirement of equal application and on the general matter of unlimited pricing flexibility.

The defendants argue further that oral and written comments received during the rulemaking period reflect the industry's awareness that the agency was reevaluating the equal application and deemed recovery requirements.

The Court does not share the defendants' perception of the agency's rulemaking activities between September 10 and December 5, 1974.

█ Section 4 of the APA requires a notice of proposed rulemaking to include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). This requirement serves the purpose of allowing meaningful comment by the public of contemplated agency action. Hence, "the adequacy of the notice must be tested by determining whether it would fairly apprise interested persons of the 'subject and issues' before the Agency." *American Iron & Steel Inst. v. EPA,* 568 F.2d 284, 293 (3d Cir. 1977).

█ Under this standard of adequacy, the September 10, 1974 notice altogether fails to pass muster. Nothing in the September 10 preamble suggests that the agency was interested in evaluating *de novo* a requirement of equal application of increased product costs in prices below base prices. Indeed, the only notice afforded by the agency concerned only *modifications* of such a requirement, and specifically advised interested persons that the agency was not contemplating the elimination of the requirement. As for the comments actually submitted by interested persons, a fair reading of the administrative record fails to support the defendants' assertion that interested parties were generally aware of the opportunity available to them to comment on the underlying merits of an equal application or deemed recovery rule. *Cf: Wagner Electric Corp. v. Volpe,* 466 F.2d 1013, 1019 (3d Cir. 1972).

For this reason, it is apparent that no valid equal application rule, with or without a deemed recovery component, was promulgated on December 5, 1974.

**1270**

### D.

Turning now to the challenges to the May 5, 1977 rule, this Court has determined that no valid equal application requirement affecting the pass-through of increased product costs in actual sales prices and in base prices existed in December, 1974. After examining the regulatory activities during the years 1975 and 1976, and during the Spring of 1977, this Court must further conclude that no valid equal application requirement, or deemed recovery rule, was in effect at the time of the May 5, 1977 amendment.

The Court therefore holds that the May 5, 1977 amendment to the price rule effected a substantive change in the Regulations, and thus should have issued in accordance with applicable rulemaking procedures. Because these procedures were not followed, the amendment was unlawful.

### III.

Accordingly, it be and hereby is

ORDERED, that the plaintiffs' motion for summary judgment is granted and the defendants' cross-motion for summary judgment is denied; and it is further

ORDERED, ADJUDGED, AND DE-CREED, that the original three cent rule, 10 C.F.R. § 212.83(c)(2), contained no equal application requirement pertaining to the pass-through of increased product costs; and it is further

ORDERED, ADJUDGED, AND DE-CREED, that the September 5, 1974 equal application rule, with the deemed recovery component, 10 C.F.R. § 212.83(d)(1), was procedurally invalid; and it is further

ORDERED, ADJUDGED, AND DE-CREED, that the December 5, 1974 cost bank rule, 10 C.F.R. § 212.83(e)(1), was procedurally invalid; and it is further

ORDERED, ADJUDGED, AND DE-CREED, that the May 5, 1977 amendment to the price rule, 10 C.F.R. § 212.-83(h)(2)(iv), was procedurally invalid.